T.C. Memo. 2012-360

UNITED STATES TAX COURT

JOHN J. NORMAN, JR., AND M. ELIZABETH NORMAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14289-09.                                    Filed December 27, 2012.

Helen E. Marmoll, for petitioners.

Scott A. Hovey and Anne W. Bryson, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, <u>Chief Judge</u>:  Respondent determined deficiencies of $16,042

and $5,090 in petitioners' Federal income tax for 2005 and 2006, respectively, and

**[\*2]** an accuracy-related penalty of $1,018 pursuant to section 6662 for 2006.[1]

Respondent having conceded the penalty, the issue for decision is whether petitioners are entitled to deduct, as investment interest, certain amounts of mortgage interest that do not constitute qualified residence interest under section 163(h)(3), on the ground that their mortgage loan is properly allocated between residential property and nonresidential investment property.

FINDINGS OF FACT

The parties have stipulated some facts, which we so find. When they petitioned the Court, petitioners resided in Virginia.

Background

Petitioner John J. Norman, Jr., is the principal in Norman Realty, Inc., a commercial brokerage firm. In early 2003, when they were living in Alexandria, Virginia, petitioners began looking for a home in Warrenton, Virginia, where Mr. Norman had grown up.

On October 27, 2003, petitioners entered into a contract to purchase for $1,040,000 a house on 1.29 acres in the Old Town area of Warrenton. After a

---

[1]Unless otherwise noted, all section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] home inspection, however, petitioners learned that the house had significant structural defects, and for that reason they terminated the purchase contract.

The Yorkshire Property and the Sellers' Development Plans

Petitioners later became interested in a historic residence on Winchester Street in the Old Town area of Warrenton (Yorkshire property). The Yorkshire property was a single-family residence on 9.875 acres. The house, which was then being rented out, was in disrepair. In December 2003 Mr. Norman toured the Yorkshire property with Virginia Farrar, who was one of three coowners of the property and who spoke for all three owners in connection with any matters concerning the property.

During this tour Ms. Farrar explained to Mr. Norman that she and the other Yorkshire property owners had investigated the possibility of selling only the house and about three acres, leaving the remaining acreage for development in conjunction with acreage in an adjoining property (Yonder Lea property). The Yonder Lea property consisted of a single-family residence on about 11 acres and was owned by Yonder Lea, LLC, the managing partner of which was Ms. Farrar's cousin, who was also one of the three coowners of the Yorkshire property. Both the Yorkshire property and the Yonder Lea property had zoning for quarter-acre lots, but use of that development right was subject to the creation of an access road

**[*4] s**atisfactory to the Town of Warrenton. In preparing for a possible development project, the owners of the Yorkshire and Yonder Lea properties had retained a development consultant and an architect to develop plans for villas on the back part of the properties (i.e., the part of the properties most remote from Winchester Street) after placing a conservation and preservation easement on the properties, so as to allow for lots larger than the quarter acre permitted by the applicable zoning laws. The property owners had not yet proceeded with these development plans, however, because they had been unable to convince the Town of Warrenton to allow access to the proposed development from Winchester Street.

Negotiations To Buy the Yorkshire Property

According to Mr. Norman's testimony, it was during his initial tour of the Yorkshire property in December 2003 that Ms. Farrar, having explained the owners' development plans for the Yorkshire and Yonder Lea properties, stated that the price for the Yorkshire residence and three acres was $1 million. Consistent with Ms. Farrar's explanation of the owners' development plans, it was anticipated that the Yorkshire property would be subdivided before petitioners purchased the house and three acres and that petitioners would buy just the front portion of the property that bordered Winchester Street. Also according to Mr.

**[*5]** Norman's testimony, in February 2004, after making two more visits to the Yorkshire property, Mr. Norman called Ms. Farrar and told her that petitioners would buy the house and three acres for $1 million. But by that time the sellers had apparently reconsidered; in any event, the deal did not move forward on those terms. In an effort to persuade her to go forward with the deal, Mr. Norman offered Ms. Farrar the benefit of his real estate expertise and prepared for her some financial analyses showing how she might profitably develop the Yorkshire and Yonder Lea properties after selling the house and three acres to petitioners for $1 million. Nevertheless, in August 2004 Mr. Norman learned that the Yorkshire property owners would not sell the house and only three acres to petitioners; instead the owners offered to sell them the entire property for $1.8 million.

After making some financial analyses, Mr. Norman decided that he could purchase the Yorkshire property for $1.8 million and recover the additional $800,000 by developing part of the property after subdividing it into at least seven additional lots. In September 2004 petitioners hired a civil engineering firm, Dewberry & Davis, LLC (Dewberry), to provide a limited feasibility study for a development project involving the combined Yorkshire and Yonder Lea properties. They later requested a separate limited feasibility study for developing only the Yorkshire property.

**[*6]** <u>Purchase Agreement for the Yorkshire Property</u>

On December 7, 2004, petitioners signed an agreement to purchase the Yorkshire property for $1.8 million. The purchase agreement makes no allocation of the purchase price between subparcels, and the parties to the transaction never discussed any such allocation. The purchase agreement provided for a 90-day study period, during which petitioners could investigate the property and determine whether to go forward with the purchase. The agreement also provided that to facilitate financing and development, petitioners could elect before settlement to subdivide "the residential structure and approximately three (3) acres from the balance of the Property and take ownership of the two resulting parcels as separate parcels". Petitioners did not elect to subdivide the property, because they were unsure how they would configure the three acres until they knew for sure what access could be provided for the acreage to be developed.[2] The purchase agreement also stated that before settlement the sellers wished to place on the property a historic conservation easement that would limit the number of residential units on the property to eight, including the existing residence. In the

_____

[2]There were at least three possible means of access: (1) from Winchester Street, if the safety concerns of the Town of Warrenton could be satisfied; (2) from a right of way at the back of the property; and (3) through a connection into a subdivision to the south of the Yorkshire property.

[*7] purchase agreement petitioners and the sellers acknowledged that "this deed restriction has a significant impact on the value of the Property and that Seller shall have all rights to claim any tax credits or other benefits derived from the diminution of value."

Over the next several months, petitioners explored subdividing the Yorkshire property. On January 10, 2005, they contracted with Dewberry to provide a refined version of the limited feasibility study of a portion of the property and a conceptual layout plan for a subdivision. Between January and March 2005, Dewberry created a number of plats showing drainage feasibility, available sewer hookups, and ingress and egress onto Winchester Street.

On March 16, 2005, without petitioners' knowledge, Ms. Farrar submitted an application to the Virginia State Historic Preservation Officer to have the Yorkshire property listed on the State registry and the National Registry of Historic Places; the property was accepted into the registries shortly thereafter. Petitioners discovered the listings on March 22, 2005. Concerned about the listings' impact on the property's development potential, petitioners attempted to negotiate an addendum to the purchase agreement that would divide the Yorkshire property into two parcels, one consisting of the residence and approximately three acres and the other consisting of the rest of the property with 75 feet of frontage

[*8] on Winchester Street. The sellers did not accept the addendum. Eventually, the sellers waived the provision in the purchase agreement that a historic conservation easement be placed on the property. This waiver convinced petitioners to proceed with the purchase because it positively affected the property's value.

In preparing for the closing, petitioners obtained from Dewberry an area tabulation allocating three acres to the residence and the rest of the acreage to the back portion of the property, but configured in such a way that both parcels had frontage on Winchester Street. Petitioners also contracted with Dewberry to perform a boundary check of the property, plot a subdivision creating two parcels, and set pipes for the new lots as needed.

Purchase of the Yorkshire Property

On May 4, 2005, petitioners settled on the Yorkshire property for $1.8 million. They purchased the Yorkshire property intending to continue the development process that the sellers had started to develop about seven acres. At the closing petitioners executed a credit line deed of trust note, whereby they agreed to pay "the principal sum" of $2,310,000 plus interest at a stated rate. The loan agreement similarly states that the bank agreed to make "a loan in the principal amount" of $2,310,000. The parties have stipulated that of this amount,

[*9] $1,760,000 was for the acquisition of the Yorkshire property (the house plus the 9.875 acres) and the remaining $550,000 was for renovation costs anticipated for the house.  Security for the loan included the Yorkshire property as well as petitioners' existing Alexandria residence, which was listed for sale.

On July 13, 2005, petitioners closed on the sale of their Alexandria residence, applying $462,000 of the proceeds as a partial payoff of the mortgage loan on the Yorkshire property.[3]  As of that date, the bank had advanced petitioners $326,635 to cover renovation costs.  Petitioners subsequently took additional draws against the line of credit to cover additional renovation costs; the draws for renovation costs ultimately totaled $549,761.  Petitioners moved into the Yorkshire house in August 2005 after completing renovations.

On October 17, 2006, having made certain payments on the Yorkshire property loan in addition to the payoff resulting from the sale of their Alexandria

---

[3]An internal bank email dated July 11, 2005, indicates that after the partial release of $462,000, the "maximum loan balance"--which we interpret to refer to the limit of the credit line--was $1,848,000.  A computer printout showing the disbursement and repayment history for the bank loan shows that the $462,000 payoff on July 15, 2005, reduced the then-outstanding principal balance due from $2,066,635 to $1,624,635.

**[*10]** residence, petitioners refinanced their mortgage for a new principal amount of $1,860,000.[4]

Purchase Agreement for Yonder Lea Property

On June 15, 2005, petitioners entered into an agreement to purchase the Yonder Lea property for $1.8 million. The purchase agreement provided for a study period and several option periods. Petitioners coordinated with Larry Doll, a developer, who was primarily responsible for handling the potential joint development of portions of the Yorkshire and Yonder Lea properties. On August 1, 2005, petitioners hired Wetland Studies & Solutions, Inc., to conduct an environmental study with respect to the proposed development of the properties. By October 3, 2005, petitioners received approval from the U.S. Army Corps of Engineers of the wetlands delineation on the project planned for the property and the adjacent property. Over the next several months, petitioners and Mr. Doll continued to actively pursue the Town of Warrenton's approval to develop the two properties. On January 11, 2006, a deposit was made on the purchase of the Yonder Lea property pursuant to the purchase agreement.

---

[4]At this time, the original mortgage had an outstanding principal balance of $1,847,761.

[*11]  At some point it became apparent that Mr. Doll did not want to proceed with the development.  In a letter dated May 5, 2006, to the sellers and their attorney, Mr. Norman stated that "it has become apparent that the process of obtaining permits and approvals for development of portions of the Yonder Lea and Yorkshire properties would be a long and difficult process" and that "The Town is resolute in their desire to limit access from Winchester Street".  In the letter Mr. Norman requested an amendment to the purchase agreement that would allow him to pursue with the town a deal that would permit the owners of the Yorkshire and Yonder Lea properties to transfer their development rights.  The letter stated that,  "There is really no way to quantify the values" of the development rights to be transferred until the town had taken certain actions and negotiated for the transfer of the development rights.  The sellers did not accept the proposed amendment, and on July 14, 2006, the parties released the purchase agreement.  At this point, Mr. Norman considered either transferring some of the Yorkshire property's development rights, granting a conservation easement on the property, or donating part of the property to the town.  Mr. Norman ultimately did not undertake any of these actions.

As of the date of trial, petitioners had not subdivided the Yorkshire property.

[*12] Petitioners' Tax Returns

On their 2005 joint Federal income tax return, petitioners claimed an $88,507 home mortgage interest deduction with respect to the Yorkshire property. They reported no net investment income and claimed no investment interest deduction. On their 2006 joint return, petitioners claimed an $85,174 home mortgage interest deduction and a $17,951 investment interest deduction with respect to the Yorkshire property.[5]

Respondent's Determinations

Respondent determined that for 2005 petitioners' home mortgage interest deduction was limited to $42,673, the amount paid with respect to $1.1 million of indebtedness. Respondent further determined that for 2006 petitioners were entitled to a home mortgage interest deduction of $86,816 (which was slightly more than petitioners had claimed on their 2006 return) for interest paid on $1.1 million of indebtedness. Respondent disallowed the investment interest deduction that petitioners had claimed for 2006, however, on the ground that it was paid on debt in excess of $1.1 million to acquire their residence.

[5]Petitioners attached a Form 4952, Investment Interest Expense Deduction, to their 2006 return, reporting $58,653 in investment interest paid and $17,951 in net investment income. Petitioners limited their investment interest deduction to $17,951 for 2006 and reported $40,702 as disallowed investment interest expense to be carried forward to 2007.

**[*13]**                                              OPINION

I.      Burden of Proof

In general, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer has the burden of proving that the determinations are in error.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  In particular, deductions are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any claimed deductions.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  The taxpayer bears the burden of substantiating the amount and purpose of each expense claimed as a deduction.  See Higbee v. Commissioner, 116 T.C. 438, 440 (2001); Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976).

Section 7491(a)(1) provides that if, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's proper tax liability, the Commissioner shall have the burden of proof with respect to that issue.  Credible evidence is evidence the Court would find sufficient upon which to base a decision on the issue in the taxpayer's favor, absent any contrary evidence.  See Higbee v. Commissioner, 116 T.C. at 442.

**[*14]** Petitioners argue that pursuant to section 7491(a) the burden of proof has shifted to respondent and that uncertainty on any issue in this case should be resolved in their favor. We disagree. As discussed in more detail infra, the issue for decision is whether petitioners are entitled to deduct, as investment interest, certain amounts of mortgage interest that do not constitute qualified residence interest under section 163. Petitioners have failed to introduce sufficient evidence on which we could base an allocation of the mortgage debt between petitioners' residence and other property. Because petitioners have failed to offer credible evidence to substantiate the disputed interest deductions in amounts greater than respondent has allowed, section 7491(a) does not operate to shift the burden of proof to respondent. Accordingly, the burden of proof remains with petitioners.

II.    General Principles of Applicable Law

As a general rule, individuals may not deduct personal interest. Sec. 163(h). Limited exceptions to this general rule permit individuals to deduct investment interest and qualified residence interest. Sec. 163(h)(2).

For noncorporate taxpayers, investment interest is deductible only to the extent of the taxpayer's net investment income for the taxable year.[6] Sec.

---

[6]Investment interest disallowed under this limitation is treated as investment interest paid or accrued by the taxpayer in the succeeding taxable year. Sec.

(continued...)

**[\*15]** 163(d)(1).  Investment interest generally means "any interest * * * which is paid or accrued on indebtedness properly allocable to property held for investment." Sec. 163(d)(3)(A).  Investment interest excludes qualified residence interest.  Sec. 163(d)(3)(B)(i).

Section 163(h)(3)(A) defines qualified residential interest as any interest paid or accrued during the taxable year on:

> (i) acquisition indebtedness with respect to any qualified residence of the taxpayer, or

> (ii) home equity indebtedness with respect to any qualified residence of the taxpayer.

Acquisition indebtedness is debt used to acquire, construct, or improve a "qualified residence" and that is secured by that residence.  Sec. 163(h)(3)(B)(i).  The aggregate amount treated as acquisition indebtedness for any period cannot exceed $1 million ($500,000 for a married individual filing a separate return).  Sec. 163(h)(3)(B)(ii).  Acquisition indebtedness includes debt incurred in refinancing acquisition indebtedness, insofar as the new debt does not exceed the refinanced debt.  Sec. 163(h)(3)(B) (flush language).  Home equity indebtedness is the first $100,000 of debt ($50,000 for a married taxpayer filing separately), other

---

[6](...continued)
163(d)(2).

**[*16]** than acquisition indebtedness, secured by a "qualified residence" so long as the debt does not exceed the fair market value of the residence reduced by the qualified acquisition indebtedness. Sec. 163(h)(3)(C). As relevant here, "qualified residence" means the taxpayer's "principal residence" within the meaning of section 121. Sec. 163(h)(4)(A)(i).

Section 121 does not define the term "principal residence" but, subject to various limitations, allows for the exclusion of gain on the sale or exchange of property "owned and used by the taxpayer as the taxpayer's principal residence". Sec. 121(a). A principal residence includes both the dwelling unit and associated land. See Gates v. Commissioner, 135 T.C. 1, 8-10 (2010). In various circumstances, courts have found a principal residence to include considerable acreage surrounding the dwelling unit. See, e.g., Bogley v. Commissioner, 263 F.2d 746, 748 (4th Cir. 1959) (holding that the taxpayers' sale of 10 acres of unimproved land, less than a year after the sale of the dwelling unit and surrounding 3 acres from the original 13-acre parcel, qualified as a sale of the taxpayers' principal residence), rev'g 30 T.C. 452 (1958); Schlicher v. Commissioner, T.C. Memo. 1997-37 (holding that 43.5 of 51 acres of the taxpayer's property was his principal residence for purposes of the nonrecognition of gain provision of former section 1034).

[*17] III.    Summary of the Parties' Positions

The parties agree that the Yorkshire property (or some portion of it) was petitioners' principal residence during the years in issue.  There is no dispute that the debt giving rise to the disputed deductions was used (at least in part) to acquire and improve petitioners' principal residence and that the fair market value of this residence exceeded the amount of the associated outstanding debt.  The parties agree that the first $1 million of the debt constitutes acquisition indebtedness and that petitioners are entitled to mortgage interest deductions for interest attributable to this portion of the debt.  Respondent concedes that petitioners may also deduct interest attributable to an additional $100,000 of home equity indebtedness.  The primary issue for decision, then, is whether petitioners may deduct interest attributable to more than $1.1 million of the debt.

A.    Petitioners' Position

Petitioners contend that they paid $1.8 million for the Yorkshire property, of which $1 million was for the dwelling unit plus three acres and $800,000 of which was for "investment property" consisting of the other 6.875 acres.  Consequently, they contend, the interest on $1 million of the mortgage debt is deductible as qualified personal residence interest, and the interest on the

[*18] remaining $800,000 of the mortgage debt is deductible as qualified investment interest.[7]

### B.    Respondent's Position

Respondent's position is that petitioners may deduct, as qualified residence interest, (1) interest attributable to the first $1 million of acquisition indebtedness and (2) interest attributable to an additional $100,000 of home equity indebtedness. Respondent contends that petitioners are not entitled to deduct any additional amounts of interest paid with respect to the mortgage secured by the Yorkshire property. Respondent concedes that petitioners intended to subdivide a significant portion of the Yorkshire property at some future date. But respondent contends that, as a legal matter, petitioners may not allocate any part of the mortgage to investment property because they did not actually subdivide the property or use it for any business purpose enumerated under section 280A.[8] Respondent further contends that even if petitioners were not legally precluded

---

[7]As discussed in more detail infra, the evidence does not support any premise that the amount of the mortgage debt was exactly $1.8 million at any relevant time.

[8]As a general rule, sec. 280A(a) denies deductions with respect to the use of a dwelling unit that the taxpayer used as a residence during the taxable year. Sec. 280A(c)(1)(A), however, permits the deduction of expenses allocable to a portion of a dwelling unit that a taxpayer used exclusively and on a regular basis as the principal place of business for the taxpayer's trade or business.

**[\*19]** from allocating part of their mortgage to investment property, they have nevertheless failed to substantiate their claimed allocation.  Furthermore, respondent contends, petitioners may not deduct any investment interest for 2005 because they reported no net investment income for that year.

IV.   Analysis

   A.   Petitioners' 2005 Taxable Year

   On their 2005 joint income tax return, petitioners reported no net investment income and claimed no investment interest deduction.  In this proceeding they contend that a portion of the amount that they claimed as a mortgage interest deduction should be reclassified as investment interest deductible under section 163(h)(2).  Because petitioners reported no net investment income for 2005, however, they are not entitled to deduct any amount as investment interest for that year.  See sec. 163(d)(1).

   B.   Petitioners' 2006 Taxable Year

   For 2006 petitioners claimed a $17,951 investment interest deduction, which equaled the net investment income they reported for 2006.  This deduction is predicated on their claim that the Yorkshire property mortgage debt should be allocated between $1 million of debt for their primary residence and $800,000 of debt for investment property.  For the reasons discussed below, we agree with

**[\*20]** respondent that petitioners have failed to substantiate this claimed allocation or to provide any adequate evidentiary basis to support such an allocation. Accordingly, it is unnecessary for us to decide, and we do not decide, whether, as respondent also contends, petitioners are precluded from allocating any part of the mortgage to investment property because they did not actually subdivide the property or use it for any business purpose enumerated under section 280A.

The purchase agreement for the Yorkshire property makes no allocation of the purchase price between subparcels, and the parties to the transaction never discussed any such allocation when they entered into the purchase agreement. Some months after entering into the purchase agreement petitioners attempted to negotiate an addendum that would have divided the Yorkshire property into two parcels, one consisting of the residence and approximately three acres and the other consisting of the rest of the property with 75 feet of frontage on Winchester Street. The sellers did not accept the addendum.

Petitioners arrive at their proffered allocation of the mortgage largely on the basis of their claim that Ms. Farrar originally offered to sell them the Yorkshire house and three acres for $1 million. They observe that they expressed a willingness to pay $1.8 million only after the sellers insisted that the sale should include all 9.875 acres of the Yorkshire property. Consequently, they contend,

[*21] they paid the additional $800,000 for the extra 6.875 acres with the intention of developing this acreage. Accordingly, they conclude, $800,000 of the mortgage should be allocated to investment property, and interest associated with this portion of the mortgage should be deductible as investment interest under section 163(d)(3)(A) and not subject to the limitations on deductibility of qualified residence interest.

We disagree with petitioners' analysis. In the first instance, even assuming that the conversations with Ms. Farrar occurred as Mr. Norman testified, such conversations would not amount to a meeting of the minds as to any definite agreement. To the contrary, the evidence shows that when petitioners sought, three months after this alleged conversation with Ms. Farrar, to negotiate the deal on these terms, the sellers were no longer interested. Even if Ms. Farrar's initial comments should be construed as an offer, the sellers had the right to withdraw it at any time before acceptance, see Hoffstot v. Dickinson, 166 F.2d 36, 40 (4th Cir. 1948), and did so by insisting on selling the entire Yorkshire property for $1.8 million. Consequently, Ms. Farrar's alleged conversations with Mr. Norman in December 2003 do not adequately support petitioner's claimed basis for allocating

[*22] the mortgage debt as of the time that the purchase agreement was finally executed a year later.[9]

Moreover, the purchase agreement contained terms and restrictions not necessarily contemplated in Mr. Norman's alleged initial conversations with Ms. Farrar about selling the house and three acres for $1 million. In particular, the purchase agreement provided that the sellers intended to place on the Yorkshire property a historic conservation easement that would limit the number of residential units that could ultimately be built on the property. The purchase agreement expressly acknowledges that such a deed restriction would have a "significant impact on the value of the Property" and that any resulting tax benefits would accrue to the sellers. Ultimately, the sellers waived this provision, but only after they had, without petitioners' foreknowledge, placed the Yorkshire property on the State registry and the National Registry of Historic places--actions

---

[9]As corroboration for Mr. Norman's testimony about Ms. Farrar's purported oral offer, petitioners also point to various financial summaries that Mr. Norman prepared while petitioners were considering whether to go forward with the purchase of the Yorkshire property. But these summaries reflect only unproven assumptions about the purported investment property's value. Similarly, we reject petitioners' suggestion on brief that their attempt to purchase another house in Warrenton for $1,040,000 before purchasing the Yorkshire property is indicative of the value of the Yorkshire dwelling unit plus three acres.

**[*23]** that also presumably affected the property's investment potential and the allocation of value among any subparcels.

Petitioners have submitted no expert witness testimony to support the values upon which they seek to predicate an allocation of the mortgage debt. Making accurate valuation even more difficult is the fact that the boundaries of any actual geographic division between the Yorkshire house and the purported investment portion of the parcel remain unclear. Different plans for the Yorkshire property over time show different parts of the land being used, depending upon various factors that became known between the time petitioners entered into the purchase agreement and the time that they settled on the Yorkshire property. For instance, the addendum to the purchase agreement that petitioners proposed (and that the sellers rejected) specified that both the approximately three acres surrounding the dwelling unit as well as the additional acreage (which petitioners contend was investment property) would have frontage on Winchester Street. After the town of Warrenton refused to grant access rights from Winchester Street to the proposed development site, however, it became necessary to change the configuration of the proposed development to allow for other access.

Moreover, petitioners have failed adequately to account for the fact that the purchase of the Yorkshire property was financed with a single credit line deed of

[*24] trust note of $2,310,000, representing $1,760,000 for acquisition costs and $550,000 for renovation costs. Petitioners suggest that the $550,000 was a separate "bridge loan" that was extinguished upon the sale of their former Alexandria, Virginia, residence and consequently that it should be disregarded. This view is difficult to square with the evidence. Both the credit line deed of trust note and the loan agreement indicate that there was a single loan rather than separate loans. Petitioners' sale of their Alexandria residence in July 2005 resulted in a partial mortgage payoff of $462,000, even though as of that time the bank had advanced them only $326,635 for renovation costs. Clearly, a payoff that exceeded the funds advanced for renovation costs is not properly viewed as merely extinguishing a separate subloan for renovation costs, as petitioners suggest. Rather the evidence shows that the payoff was applied to the then-outstanding principal balance of the entire loan, which decreased from $2,066,635 to $1,624,635.[10]

---

[10]Petitioners subsequently made additional draws for renovations, which ultimately totaled $549,761. These additional draws were added to the principal amount due.

**[*25]**  On October 17, 2006, petitioners refinanced their mortgage for a new

principal amount of $1,860,000.[11]  This refinanced debt gave rise to new

acquisition indebtedness for purposes of determining the limitation of petitioner's

qualified residence interest deduction.  This refinanced debt--like the original

mortgage--was secured both by the dwelling unit, which by that time had been

improved by over one-half million dollars of petitioners' renovations, and the

9.875 acres of the Yorkshire property.  Any allocation of either the original or the

refinanced mortgage loan would need to take into account the value-enhancing

renovations to the Yorkshire house.[12]  In deciding what portion, if any, of the

---

[11]At that time the principal balance on the original mortgage loan was $1,847,761.  This outstanding balance was paid off, presumably from the refinancing proceeds, on October 24, 2006.

[12]Respondent contends on brief that because the $550,000 renovation portion of the loan was used to improve the Yorkshire house, it must be included in the amount of the acquisition indebtedness.  See sec. 163(h)(3)(B)(i) (defining acquisition indebtedness as indebtedness "incurred in acquiring, constructing, or substantially improving any qualified residence of the taxpayer" which is "secured by such residence").  This position seems inconsistent with respondent's determination in the notice of deficiency, which respondent has not otherwise sought to repudiate in this proceeding, that petitioners are entitled to deduct interest attributable to $100,000 of home equity indebtedness.  This determination, unlike respondent's position on brief, is consistent with Rev. Rul. 2010-25, 2010-44 I.R.B. 571, which holds that if a loan that otherwise would be acquisition indebtedness exceeds the $1 million cap, the excess may be treated as home equity indebtedness.  This Court has held that sec. 163(h) restricts the residential mortgage interest deduction to interest paid on $1 million of acquisition

(continued...)

[*26] acquisition indebtedness should be allocated to investment property, we cannot simply ignore, as petitioners would seem to have us to do, the extensive renovations to the house, the various draws and repayments on the note, and the ultimate refinancing of the note.

In sum, petitioners have provided no adequate evidentiary basis to support their claimed allocation, or any other allocation, of their mortgage loan between residential property and purported investment property. Accordingly, petitioners are not entitled to deduct interest expenses for 2006 greater than respondent has allowed.

To reflect the foregoing,

An appropriate decision will be entered.

---

[12](...continued)
indebtedness and that excess amounts that otherwise would be acquisition indebtedness cannot be treated as home equity indebtedness. Pau v. Commissioner, T.C. Memo. 1997-43; see also Catalano v. Commissioner, T.C. Memo. 2000-82, rev'd on other grounds, 279 F.3d 682 (9th Cir. 2002). Given respondent's concession of the issue in this case, we need not address it, see Bronstein v. Commissioner, 138 T.C. __, __ (slip op. at 7 n.6) (May 17, 2012), nor is the resolution of this matter material to our analysis supra.